IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 25-CR-10037-RGS |
| | ) | |
| DAVID SMERLING, | ) | |
| | ) | |
| Defendant | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant David Smerling stole more than $3.5 million dollars from multiple victims who placed their trust in him—a friend who saw Smerling as family, a relative with dementia, and a relative with special needs. In doing so, Smerling acted with a depraved indifference as to how his theft affected his victims, all of whom have been betrayed and at least one of which has been left financially destitute. Worse, Smerling, an attorney, continued to embezzle *even after* his arrest in this case, demonstrating his utter disregard for the Court and the rule of law. For these reasons, the government recommends a sentence at the high end of the range agreed upon by the parties, namely 108 months in prison (comprised of 84 months to run concurrently on Counts One through Six, and 24 months to run consecutively on Count Seven), along with 36 months of supervised release, restitution of $3,534,316, with the first $10,000 collected payable to Victim D, and forfeiture as outlined in the government's motion for forfeiture (Dkt. 63).

## OFFENSE CONDUCT

### A.     Victims A & B and Companies 1, 2 & 3

Between at least 2016 (as far back as bank records are available) through May 2020, Smerling embezzled more than $2.8 million from Victims A and B, a married couple in their 70s, and their companies, Companies 1, 2 and 3. PSR ¶¶ 16-20. Victim A had known Smerling for

more than two decades, having met through the temple they both attended, and considered him family. *Id.* ¶ 29; Victim A Impact Statement (Sept. 12, 2025) ("VIS-A") at 1. In 2014, Victim A hired Smerling to oversee bookkeeping at Companies 1, 2 and 3 and his personal finances at an inflated fee of $10,000 per month as a kind gesture after Smerling's investment in Company 1 was not profitable. PSR ¶ 22. Almost immediately, Smerling took advantage of Victim A's goodwill and began paying himself more than the agreed upon monthly fee. *Id.* ¶¶ 24-28. Smerling even tried to recruit Employee 1, whom Victim A had hired to assist Smerling, into doubling his pay in exchange for a kickback to Smerling. *Id.* ¶ 30. Smerling told Employee 1 that Victim A would not notice he was signing additional checks given Victim A's advance age. *Id.*

Smerling also used Company 1 funds to pay for personal credit card charges, including thousands of dollars in travel expenses for flights for himself and his wife, as well as for various women with prior prostitution charges to fly to Boston. *Id.* ¶¶ 31, 65; *see also id.* ¶ 48. Smerling embezzled additional sums from the Companies and hid his actions by moving funds from the Companies' bank accounts to an account in Victim B's name that Smerling controlled, before moving the funds to one of a half dozen accounts in Smerling's name. *Id.* ¶¶ 32-39, 44-45. Smerling also applied for and benefited from two loans—one in the name of Victim A and one in the name of Victim B—by using their personal identifiers without their knowledge or authorization and used Company funds to make payments on the loans. *Id.* ¶¶ 46-47.

Perhaps most egregiously, Smerling attempted—twice—to steal $350,000 from Company 3. Smerling first transferred $350,000 from Company 3's bank account to an account in his name in March 2020. *Id.* ¶ 40. Likely afraid this large theft would be noticed, Smerling then asked Victim A for a $350,000 loan in April 2020. *Id.* ¶ 41. Victim A agreed to lend Smerling the full amount, but asked Smerling to put up his home in Lexington as collateral. *Id.* Smerling agreed,

2

despite that he had transferred his interest in the home to his wife more than two decades earlier. *Id.* Employee 1 convinced Victim A to require Smerling to share the login information to the online banking portal for the Companies' accounts, which Smerling had refused to share, before lending the money. *Id.* Upon accessing the banking portal with the newly provided password, Employee 1 discovered that Smerling had already taken $350,000 from Company 3 the month prior. *Id.* When confronted, Smerling offered to pay back the $350,000 he had already taken, but only after he received *another* $350,000 from Victim A. *Id.* Victim A did not agree, and demanded the return of the $350,000 that Smerling had already taken. *Id.*

The following month, Employee 1 logged into the Companies' bank accounts in the online portal and saw that Smerling had not yet returned the $350,000, despite having the funds in a linked account. *Id.* ¶ 42. Employee 1 then initiated an electronic transfer to return the $350,000 from Smerling's account to the Company 3 account. *Id.* When Employee 1 attempted to login to the Companies' bank accounts a few days later, however, he found the password had been changed. *Id.* ¶ 43. Upon calling the bank to report the login issue, Employee 1 also learned that $350,000 had again been taken from Company 3's account. *Id.* Victim A confronted Smerling, who confessed his theft and agreed to repay Victim A. *Id.* Following this interaction, Smerling's access to the bank accounts of Victims A and B and Companies 1, 2, and 3 was cut off. *Id.*

In total, in 4.5 years, Smerling embezzled at least $2,877,462 from Victims A and B and their companies, not including the twice-attempted theft of $350,000, which was eventually returned after Victim A confronted Smerling. *Id.* ¶ 66. Beyond the financial loss, Smerling's actions left Victim A and his family feeling profoundly betrayed. VIS-A at 2. Victims A and B were forced to sell their home of 35 years as well as a vacation home on Cape Cod and to borrow significant sums to pay back taxes Smerling had never paid when he was overseeing their

3

financials. *Id.* Smerling even took away the pride Victims A and B had in being in a position to leave an inheritance to their children, as Smerling stole that money and more. *Id.* Even worse, when Victims A and B raised their concerns about Smerling to members of their shared temple, Smerling convinced the congregation to turn on Victims A and B, even though Smerling was the culprit, forcing Victims A and B to leave their decades-long congregation in their 70s. PSR ¶ 66.

    **B.**    **Victim D**

Between May 2020 and August 2021, Smerling embezzled nearly half a million dollars from Victim D. PSR ¶ 51. Victim D has special needs, and Victim D's mother set up a special needs trust to provide for Victim D after her death. *Id.* The family considered Smerling a trusted advisor and appointed him successor-trustee upon the death of Victim D's mother in 2017. *Id.* Once trust funds became available to Victim D a year after his mother's death, Smerling told Victim D he would give him $250 per month from the trust for Victim D's living expenses. *Id.* ¶ 50. While this amount was not sufficient to cover Victim D's food, clothing, and health expenses, Smerling nevertheless made Victim D feel guilty for considering asking for more. *Id.* ¶ 67; Victim D Victim Impact Statement ("VIS-D") at 1. Smerling also moved Victim D into Section 8 housing, despite that the trust had nearly half a million dollars and Smerling continued to reside in one of the wealthiest towns in Massachusetts. PSR ¶ 67.

Within the same month of losing access to the bank accounts of Victims A and B and their companies, Smerling began stealing from Victim D's trust by transferring money out of the trust to bank accounts Smerling controlled. *Id.* ¶¶ 51-52. To hide his theft once he had depleted the trust, Smerling made lulling payments to Victim D by transferring small amounts into the trust and continuing to pay Victim D $250 per month from the trust. *Id.* ¶ 53.

In total, in just over a year, Smerling embezzled at least $477,906 from Victim D, leaving

the trust depleted. *Id.* ¶ 67. As such, Victim D has no safety net; he was unable to afford basic necessities even when he was receiving money from the trust, let alone now that the trust is depleted. *Id.*; VIS-D at 1. Smerling's actions have left Victim D devastated by the betrayal of someone Victim D looked up to as a brother. VIS-D at 1-2.

C.   **Victim C**

Around the time Smerling had depleted Victim D's trust, he convinced Victim C, the 79-year-old cousin of Smerling's wife, to name him as her financial power of attorney. PSR ¶ 54. By May 2023, after the onset of dementia left Victim C unable to handle her finances, Smerling took control of Victim C's retirement and bank accounts. *Id.*[1] Almost immediately, Smerling began using Victim C's credit card for personal purchases, including his personal property taxes and a Mexican vacation.[2] *Id.* ¶ 55. Smerling also embezzled more than $150,000 from Victim C by liquidating assets in her retirement accounts, transferring the funds to Victim C's bank accounts, and then further moving the funds from Victim C's bank accounts to bank accounts Smerling controlled. *Id.* ¶ 56. When Victim C's longtime financial advisor became concerned about the rate at which Smerling was withdrawing funds from Victim C's retirement accounts, in contrast to the frugal life Victim C had lived, Smerling falsely suggested he was "gifting" the funds to his wife, who Smerling claimed was Victim C's heir. *Id.* ¶ 57. He also sought to be paid the unheard-of sum of $1,500 per month for his "services" as Victim C's power of attorney, despite that his "services" consisted of attempting to rob Victim C blind. *Id.* ¶ 58. When Victim C's financial

---

[1] In the period between Smerling's depletion of Victim D's trust and gaining control of Victim C's accounts, he and his wife signed a $2.55 million reverse mortgage on their home in Lexington. PSR ¶ 131.

[2] Smerling later falsely claimed in a letter to the Court in connection with a motion for permission to travel to Mexico for that vacation that the trip costs were "covered by my wife from her independent earnings at several part time jobs." PSR ¶ 55 n.6.

advisor required Smerling to provide receipts to justify his excessive withdrawals from Victim C's retirement accounts, Smerling made an end-run around the process by using Victim C's name and identifiers to apply for a loan in her name. *Id.* ¶ 59.

Worse still, even after Smerling was arrested in this matter and despite being specifically warned at his initial appearance that the government had concerns about his handling of Victim C's finances and ordered to transition the power of attorney to someone else, Smerling continued to embezzle substantial sums from Victim C's accounts and remained her power of attorney, in flagrant disregard of the Court's order. *Id.* ¶¶ 60-64; *see also* Dkt. 36 at 6:4-7:5, 8:4-6; 8:16-20, 10:13-21; Dkt. 8.

In total, in less than two years, Smerling embezzled at least $178,948 from Victim C. Sadly, given Victim C's dementia, she appears to think Smerling's embezzlement was somehow her fault, *see* Victim C Impact Statement (Aug. 20, 2025) at 1, when in reality he took advantage of his position of trust and her declining cognition.

## **GUIDELINES CALCULATION**

The parties agreed in the plea agreement that Smerling's total offense level under the Sentencing Guidelines was 31, based on a base offense level of 7 under § 2B1.1(a)(1); a 16-level increase under § 2B1.1(b)(1)(I) because the loss was more than $1.5 million but not more than $3.5 million; a 2-level increase under § 2B1.1(b)(2)(A)(iii) because the offense resulted in substantial financial hardship to one or more victims; a 2-level increase under § 2S1.1(b)(2)(B) because Smerling was convicted of an offense under 18 U.S.C. § 1956; a 2-level increase under § 3A1.1(b)(1) because Smerling knew or should have known that Victims C and D were vulnerable victims; a 2-level increase under § 3B1.3 because Smerling abused a position of trust; a 3-level enhancement under § 3C1.3 because Smerling committed an offense while on release; and a 3-level decrease under Section 3E1.1 because Smerling accepted responsibility for his crimes.

Following entry of the plea agreement, the government identified additional losses to the victims resulting in a loss greater than $3.5 million. The Probation Office accordingly found Smerling's total offense level was 33. The government nevertheless stands by the plea agreement.

With a Criminal History Category of I, an offense level of 31 results in an advisory Guidelines range of 108 to 135 months, plus 24 months for Count Seven which charges aggravated identity theft, for a total Guidelines sentencing range of 132 to 159 months.[3]

## SENTENCING RECOMMENDATION

The relevant factors under 18 U.S.C. § 3553(a) support the imposition of a sentence at the high end of the agreed-upon range. The government respectfully submits that a total sentence of 108 months balances the heinous nature of Smerling's prolonged fraud against multiple vulnerable victims with his age, health, and other personal characteristics.

A.   **The Nature, Circumstances, and Seriousness of the Offense**

Smerling's crimes were abhorrent. He preyed on vulnerable family and friends and took advantage of their goodwill, advanced age, cognitive decline, and special needs. He exploited their trust and caused substantial financial harm. His conduct forced Victims A and B to sell their primary and vacation homes, left Victim D in Section 8 housing without enough money to pay for food, let alone the safety net his mother set up for him, and deprived Victim C of funds that could have been used for her round-the-clock medical care, all while Smerling enriched himself. In addition to sending more than $1.5 million to at least a dozen women, bank records show that, between 2016 and April 2025, Smerling spent more than $100,000 on luxury items and jewelry, almost $65,000 on travel and vacations, more than $600 per month at the Hair Club for Men, and

---

[3] Were the Court to adopt the Probation Office's calculation, the Guidelines sentencing range would be 135 to 168 months, plus 24 months on Count Seven, for a total Guidelines sentencing range of 159 to 192 months.

several thousand dollars on the website OnlyFans.[4] Beyond the financial harm, Smerling left his victims betrayed and without the friend/brother figure/mentor they had come to rely on.

Further, Smerling's crimes were not a momentary lapse in judgment. He engaged in thousands of transactions over nearly a decade and caused more than $3.5 million in loss. His actions were calculated: he moved money among multiple bank accounts he controlled and even between victim accounts to hide his scheme and make it difficult to detect. He continued to steal even after he was repeatedly caught: first, he attempted to steal $350,000 from Company 3 after he was caught stealing that sum the first time; second, he went on to embezzle from Victims C and D after Victim A terminated him for his theft; and third, he continued to steal from Victim C even after his arrest in this case and a Court order that he stop. The ongoing and odious nature of Smerling's offenses weighs heavily in favor of a sentence at the high end of the agreed-upon range.

### B.     History and Characteristics of the Defendant

Despite a troubled upbringing, Smerling became a lawyer, married, and established a close-knit family. He was smart and hardworking, having completed college in three years. He was active in his temple and well-regarded in his community. And he reports a supportive relationship with his family.

Notably, Smerling was more than 65 years old—nearly 50 years removed from his troubled childhood—when his offenses began in 2016. Further, while he suggests he was targeted by young women who draw elderly men in for the purpose of financially defrauding them, he ignores that he used more than $2 million of the money he stole for himself. Additionally, at least one of the women reported she was only 18 when she met Smerling (who would have been 59 at the time), and statistically, sex workers are primarily a vulnerable population who resort to prostitution to

---

[4] OnlyFans is a content subscription service primarily known for its adult content.

obtain drugs, to afford food or housing, or to support their children or family.[5] That some of the women would, according to Smerling, "graciously decline" his offer of money when they could not afford rent or food undermines the suggestion that he was the target of a sophisticated fraud on elderly men. Smerling's desire to help these women pay for food, heat, and other essentials is also in contrast to his theft from Victim D, who Smerling placed in Section 8 housing and guilted into withdrawing his requests for more funds from his trust despite that Victim D did not have enough money for food and had to rely on neighbors for his basic subsistence.

The government recognizes that at 75 years old, incarceration may be tougher on Smerling than it would be on a younger defendant. The government's below-guideline recommendation—approximately 20 percent below the low end of the Guidelines as calculated by the parties and more than 30 percent below the low end of the Guidelines as calculated by the Probation office—accounts for Smerling's age and personal circumstances.

Additionally, while Smerling reports a number of health issues (despite reporting that he was in good physical health with no medical problems upon his arrest in January 2025, *see* Pretrial Services Report (Jan. 14, 2025)), they are all typical of a man his age, do not require significant intervention, and can be managed by the Bureau of Prisons. The defense letter from Kristin Dame, MA, LMHC, quotes a study finding that "older adults are also vulnerable to dying in correctional custody." But the same is true of older adults who are not in custody—more people 75 and older die in the United States compared to those under 75, regardless of their custodial status.[6] Similarly,

---

[5] Footer, K., *et al.*, "Entry to Sex Trade and Long-Term Vulnerabilities of Female Sex Workers Who Enter the Sex Trade Before the Age of Eighteen," J. URBAN HEALTH (Feb. 7, 2020), 97(3):406-417, *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC7305278/.

[6] *See, e.g.*, Murphy, S., *et al.*, "Mortality in the United States, 2023," NCHS Data Brief No. 521 (Dec. 2024), *available at* https://www.cdc.gov/nchs/products/databriefs/db521.htm#:~:text=From%202022%20to%202023%2C%20death,Figure%203%2C%20Table%203) (hereafter, "Mortality in the U.S., 2023").

that another study Ms. Dame cites found that 89% of federal prisoners who died in custody died of illness is also applicable to non-incarcerated individuals. Among the leading causes of death in the United States, more than 90% result from illness.[7] Further, a sentence of 108 months will result in approximately 16 months of good time credit and up to 12 months toward early release under the First Step Act, meaning Smerling would be approximately 81 years old when released from prison—hardly the death sentence Ms. Dame foretells.

      **C.**      **Deterrence and Promotion of Respect for the Law**

Both general and specific deterrence and the need to promote respect for the law factor into the government's sentencing recommendation. The government has serious concerns about Smerling's risk of recidivism given that he continued to embezzle even after his arrest in this case, not to mention his attempt to take $350,000 from Company 3 a second time, after he had been caught the first time. The (1) length of Smerling's theft—more than nine years based on available bank records; (2) amount stolen—more than $3.5 million; (3) identity of the victims—close friends and family, all with vulnerabilities; and (4) repeated nature of his offense, even after being caught, weigh in favor of a sentence at the high end of the agreed-upon range.

The need for general deterrence also supports the requested 108-month sentence here. Embezzlement by a person holding a position of private trust is difficult to detect, as evidenced by the 4.5 years that went by before Victim A uncovered Smerling's scheme. It is even more difficult to detect when there is a vulnerable victim, such as Victim C who has dementia, who would never have caught on to Smerling's theft. A meaningful sentence is necessary to deter others holding similar positions, particularly over vulnerable populations, from engaging in this kind of theft.

---

[7] *See* Centers for Disease Control, "Leading Causes of Death," *available at* https://www.cdc.gov/nchs/fastats/leading-causes-of-death.htm (citing Mortality in the U.S., 2023).

### D.    Avoiding Sentencing Disparities and Providing Just Punishment

Data from the Judiciary Sentencing Information ("JSIN") system indicates that a sentence of 108 months' imprisonment conforms with sentences imposed in other similar cases. For the 11 defendants sentenced during fiscal years 2020 to 2024 whose primary Guideline was Section 2B1.1 and who were convicted of at least one count under 18 U.S.C. § 1028A, and whose total offense level was 31 (as agreed upon by the parties in the plea agreement), JSIN provides that 100% were sentenced to a period of incarceration, with the average sentence being 113 months and the median sentence being 118 months. The 108-month recommendation by the government is slightly below these averages, which again accounts for Smerling's age and other personal circumstances.

### RESTITUTION

The victims in this case suffered the following financial losses:

- Victims A & B and Companies 1, 2 & 3:  $2,877,462
- Victim D:  $477,906
- Victim C:  $178,948

While each victim suffered significant losses, the effect on Victim D has been the most pronounced. As an individual with special needs, Victim D receives SSDI, but it is not sufficient to cover his basic expenses, despite living in modest Section 8 housing. Victim D relied on the meager $250 per month that Smerling gave him from his trust before depleting it. The government understands Smerling's family has continued to provide this monthly payment to Victim D, but it is unclear how long they will continue. As noted above, even with the monthly $250 payment, Victim D found himself having to ask neighbors for food when his money ran out. Under 18 U.S.C. § 3664(i), the Court "may provide for a different payment schedule for each victim based

11

on the type and amount of each victim's loss and accounting for the economic circumstances of each victim." Accordingly, the government requests that the restitution order provide that the first $10,000 of restitution collected be paid to Victim D, with any sums collected above that amount distributed pro rata among the victims.

## CONCLUSION

For the reasons stated above, the government recommends a sentence of 108 months in prison (comprised of 84 months to run concurrently on Counts One through Six, and 24 months to run consecutively on Count Seven), along with 36 months of supervised release, restitution of $3,534,316, with the first $10,000 collected payable to Victim D, and forfeiture as outlined in the government's motion for forfeiture (Dkt. 63).

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By: */s/ Kristen A. Kearney*
Kristen A. Kearney
Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

Dated: October 3, 2025                */s/ Kristen A. Kearney*
Assistant United States Attorney